UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JORGE OTERO,

Plaintiff,

– *against* –

NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT; ADOLFO CARRION JR.; ANN MARIE SANTIAGO; THE CITY OF NEW YORK; ERIC ADAMS, THE MAYOR OF NEW YORK CITY; WASHINGTON SQUARE SOUTHEAST APARTMENTS INC.; *and* METRO MANAGEMENT AND DEVELOPMENT INC.,

Defendants.

**OPINION & ORDER**

24-cv-8600 (ER)

RAMOS, D.J.:

Jorge Otero, proceeding *pro se*, brings this action against the New York City Department of Housing Preservation and Development, Adolfo Carrion, Jr., Ann Marie Santiago, the City of New York, and Eric Adams (collectively the "City Defendants"), in addition to Washington Square Southeast Apartments Inc. and Metro Management and Development Inc. (collectively the "Building Defendants"). Otero alleges that Defendants discriminated against him with the intention of permanently displacing him from affordable housing. Doc. 9 ¶ 2. Otero asserts violations of his civil rights under federal law and state tort claims for fraudulent concealment and negligent misrepresentation. *Id.* ¶¶ 79–97. Before the Court are the City Defendants' and the Building Defendants' motions to dismiss the first amended complaint ("FAC"). Docs. 35, 37. For the reasons set forth below, the motions are GRANTED.

# I. STATEMENT OF FACTS

## A. The Parties.

Jorge Otero ("Otero") resides at 505 LaGuardia Place, New York, New York 10012 (the "Building"). Doc. 9 at 1. Otero alleges that he has various chronic medical conditions, among them "escalated posttraumatic [stress] disorder…, bipolar disorder and chronic pulmonary conditions." *Id.* ¶ 1.[1] Because of these conditions, Otero alleges he is an individual with a disability. *Id.* ¶ 3.

The Building is owned and operated by Washington Square Southeast Apartments, Inc. ("WSSA"), a limited-profit and limited-dividend mutual housing corporation that participates in the Mitchell-Lama program under New York's Private Housing Financing Law. *Id.* ¶ 5; N.Y. Priv. Hous. Fin. Law §§ 10–37. "A Mitchell–Lama cooperative is privately owned housing whose construction has been funded by the public." *Robinson v. Lindsay Park Housing Corp.*, No. 00 Civ. 6305 (EHN), 2001 WL 483493, at *3 (E.D.N.Y. Mar. 12, 2001), aff'd sub nom. *Robinson v. New York City Department of Housing Preservation & Development*, 37 F. App'x 571 (2d Cir. 2002). The state provides "long-term, low-interest government mortgage loans to developers on the condition that the resulting development be subject to rent regulation." *United States v. Glenn Gardens Associates*, L.P., 534 F. App'x 17, 19 (2d Cir. 2013) (summary order).

Pursuant to the Private Housing Financing Law, WSSA is subject to supervision and regulation as a Mitchell-Lama participant. N.Y. Priv. Hous. Fin. Law § 32. The New York City Department of Housing Preservation and Development ("HPD") is the agency that regulates and supervises WSSA's participation.[2] Doc. 9 at 1; *Id.* ¶ 5. Pursuant to City regulations, all Mitchell-Lama housing companies must select a managing agent to

---

[1] The FAC refers to the diagnosis as "post traumatic distress disorder" and "Post Traumatic Street Disorder." Doc. 9 ¶¶ 1, 86. The Court understands Otero to mean post-traumatic stress disorder.

[2] As the City Defendants note, there are both City- and State-sponsored Mitchell-Lama developments. Doc. 36 at 10 n.2. HPD supervises City-sponsored developments while New York State Homes and Community Renewal supervises State-sponsored developments. *Id.*

provide management services for the property. 28 R.C.N.Y. § 3-16(a). Metro Management and Development Inc. ("Metro") is WSSA's registered managing agent.[3] *Id.* ¶¶ 7–8. Otero is the shareholder-of-record of unit 9B. *Id.* ¶¶ 1–2, 13–15.

The City Defendants include HPD,[4] the City itself, and several City employees and elected officials. *Id.* at 2. As mentioned, HPD is the City Department that regulates and supervises Mitchell-Lama housing corporations like WSSA. *Id.* ¶ 9. Adolfo Carrion Jr. served as HPD Commissioner and Ann Marie Santiago as HPD Deputy Commissioner, respectively, while Eric Adams served as Mayor.[5] *Id.* at 2.

**B. Otero's complaints.**

Otero alleges a wide range of issues attributable to the Building and City Defendants.[6] In short, Otero complains about the Building's negligent management and operations, failure to address indoor environmental hazards, and mail tampering. Doc. 9 ¶¶ 15–68. As to the City Defendants, Otero alleges their failure to inspect, lack of

---

[3] The City Defendants allege that HPD and its officials have no role in the daily operations, maintenance, or management of Mitchell-Lama developments and merely play a supervisory role, while WSSA and Metro operate the building. Doc. 36 at 10.

[4] Otero's claims against the HPD must be dismissed because an agency of the City of New York is not an entity that can be sued. N.Y. City Charter ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *see also Emerson v. City of New York*, 740 F. Supp. 2d 385, 396 (S.D.N.Y. 2010). In light of Otero's *pro se* status, and because Otero also asserts claims against the City of New York, the Court construes all mention of HPD as against the City of New York.

[5] As the City Defendants note, the caption omits whether the individual defendants are named in their official capacity and there are no allegations specific to the individually-named defendants. Doc. 36 at 8 fn.1. The City Defendants accordingly take the position that the individuals are named in their official capacities. *Id.* The Court will do the same. Because Otero is suing the individual the City Defendants in their official capacities, the Court treats these as synonymous with the claim against the City of New York. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *see also Astacio v. City of New York*, No. 23-7598, 2025 WL 80069, at *1 (2d Cir. Jan. 13, 2025) (summary order).

[6] Many of Otero's allegations do not bear on any claim in this action. For example, the FAC complains of the City's "failure to serve the public," the City's "unprecedented illegal migrant accommodations," and Building Defendants' failed or incomplete preventative maintenance projects. Doc. 9 ¶¶ 36–41, 52–58. This is particularly true with regards to the exhibits attached to the FAC, which involve matters like carrying charge increases. See, e.g., Doc. 9-1. Because these allegations do not bear on Otero's claims, they are not recited in the summary of facts.

oversight, conspiracy with the Building Defendants to "conceal their respective deficiencies," and deliberate withholding of documents and information. *Id.* ¶ 25–29. Otero contends the City's acts and omissions are "maliciously intended to further demoralize [Otero] from further filing complaints with HPD's Code Enforcement." Doc. 9 ¶ 97. In this section, the Court summarizes Otero's history of raising concerns to the Building Defendants and the City Defendants.

*1. Complaints against the Building Defendants.*

Otero alleges that Defendants persistently failed to abate secondhand smoke in the Building, along with other habitability problems like leaks and mold, and failed to comply with his request for a reasonable accommodation. *Id.* ¶ 16. Because Defendants have failed to cure the hazardous conditions in his unit, Otero claims, they have caused his prolonged displacement from his apartment. *Id.* ¶ 21. Starting in April 2018, Otero contacted Metro about smoke odors in his unit. Doc. 9-5 at 16. On March 24, 2020, Otero again raised complaints about cigarette and marijuana smoke to Metro employee Paul Torrent ("Torrent"), who manages the Building. Doc. 9 ¶¶ 7–8; Doc. 9-5 at 15, 25. Otero informed Torrent of his pulmonary and allergenic conditions and of his opinion that the smoke odors impeded shareholders' rights to quiet and peaceful enjoyment of the premises. *Id.* Otero informed Torrent that, on the previous day, persistent cigarette and marijuana odors forced him and his wife to leave apartment home for hours. *Id.* at 25.

In May 2020, Otero submitted a letter to the Building Defendants titled "Re: Reasonable Accommodation" as a "qualified individual with a disability under the Federal Fair Housing Amendments Act of 1988." *Id.* at 14. He described the symptoms allegedly caused by the smoke exposure: "difficulty breathing, headaches, sore throat, loss of sleep and other symptoms." *Id.* On June 1, 2020, Torrent wrote to all residents about the smell of marijuana and cigarette smoke. Doc. 9-2 at 59. Torrent stated that "while residents have the right to smoke in their apartments, this right is contingent on the containment of smoke and smoke odor." *Id.* On September 14, 2020, Torrent wrote

again to all shareholders about the rising smoking complaints, listing the building rules surrounding proper smoking areas, and warning that "second hand smoke can have serious consequence for those who are exposed to it." *Id.* at 60. On September 21, 2020, Otero wrote again to Torrent complaining of secondhand smoke. *Id.* at 6. On November 19, 2020, WSSA's attorneys replied to Otero's letter advising him of their decision to hire a licensed vendor to abate issues ranging from mold in the living room and bathroom to asbestos in the ceilings contiguous with the living room. *Id.* at 8.

The next year, on April 23, 2021, Torrent wrote a letter to all shareholders discussing a "smoke-free building initiative." *Id.* at 50. Torrent stated that, per the bylaws, becoming a smoke-free building would require a shareholder vote. *Id.* Torrent asked shareholders to complete an informal survey to gauge interest in the initiative. *Id.* Shareholder meeting minutes dated May 12, 2021 indicate that a super-majority of 66 percent of shareholders would be required to move forward with the initiative. *Id.* at 55. On May 28, 2021, Torrent issued a memo to shareholders informing them that the survey failed after a 77-76 vote narrowly in favor of a smoke-free building. *Id.* at 53. Otero claims this survey was deceptive and "produced and circulated by Metro to evade liability." Doc. 9 ¶ 60. Otero also takes issue with the Building Defendants' claims that a supermajority was required to prohibit smoking across the building, the timing of the survey during a "vacation period," and what he considers Metro's failure to include relevant facts about the hazards associated with secondhand smoke. *Id.* ¶ 60-63.

Apart from his complaints about apartment conditions, Otero alleges bias and racially discriminatory acts by Building Defendants. Otero alleges that the Building Defendants have "disproportionately excluded minorities" from the Building, that their failure to maintain his apartment is "driven by [his] ethnic origin," and that their "illicit actions support bias and racially discriminatory acts." *Id.* 9 ¶¶ 89–92. Otero recounts a specific instance in 2014 when a flier that read "NO SPICS IN BOARD" was posted in

the hallway on his floor. *Id.* ¶ 76. He alleges this occurred while he was running for the WSSA board of directors and that it was intended to dissuade him from running. *Id.*

2. *Complaints against HPD.*

On multiple occasions, Otero communicated his concerns regarding his apartment and the Building Defendants' behavior to HPD. *Id.* ¶ 13. Otero's correspondence with HPD occurred between 2020 and 2023. *See* Doc. 9-5. Otero alleges that HPD's responses to his requests fell short of its duties under state and local law and consisted of "vague replies and eventually nonresponse." Doc. 9 ¶¶ 15, 18–19.

In 2020, Otero sent HPD letters and emails about his housing conditions. *See* Doc. 9-5.

- July 7, 2020: Otero sent a letter to the HPD commissioner at the time, notifying her of the Building Defendants' failure to address his requests for reasonable accommodation, failure to complete work orders, and concerns over his "oppressive and degrading living conditions." *Id.* at 12.
- July 14, 2020: Otero sent another letter to the HPD commissioner commenting on her failure and that of the Building Defendants' to answer his correspondence. *Id.* at 38.
- August 24, 2020: Dante Arnwine, a Constituent Services Coordinator at HPD, emailed Otero in response to his prior correspondence. *Id. at* 41–42. Arnwine wrote that Building management had scheduled the work for asbestos and mold remediation, that "[n]o further action [was] required by HPD," and that Otero should "continue to work with management regarding this matter." *Id.*
- September 8, 2020: Otero replied to HPD via email emphasizing the Building Defendants' allegedly retaliatory failure to complete work orders. *Id.* at 41. Otero stated that "instead of providing much needed relief to defeat despair, inspire hope and advance equality in safe housing conditions, [HPD has] accepted the management company's positions without further inquiries from [Otero.]" *Id.* at 41. Otero attached a letter from his physician at Bellevue Hospital dated July 19, 2020, which stated Otero was being treated for respiratory conditions and moderate persistent asthma exacerbated by exposure to tobacco and marijuana smoke. *Id.* at 43–44. Otero's physician urged the Building Defendants to grant Otero's request for a reasonable accommodation by "altering existing rules or policies that prevent smoking." *Id.*
- April 26, 2021: Otero sent another email to HPD in the same thread as above, stating that HPD's lack of oversight caused his displacement from the unit, causing him significant emotional distress and unnecessary costs. *Id.* at 46.

Approximately two years later, in 2023, Otero again sent HPD numerous letters and emails relating to his complaints. *See* Doc. 9-5.

- February 9, 2023: Otero wrote a letter to HPD requesting immediate intervention. Doc. 9-5 at 9–10. Otero requested a transfer to a different unit and reattached the July 19, 2020 letter from his physician. *Id.* at 9–10; Doc. 9-2 at 70.
- March 17, 2023: Otero again wrote a letter to HPD claiming he had been displaced from the Building and was in the process of suing the Building Defendants in state court. Doc. 9-5 at 7.
- March 22, 2023: Otero sent yet another letter to HPD requesting a more complete response to his concerns about "current uninhabitable housing conditions" and a request for an onsite inspection. Doc. 9 ¶ 13; Doc. 9-5 at 2–3. He claimed that HPD released only selective information to him "intended to discourage additional inquiries, demoralize, and impede [his] efforts in pursuing various actions against multiple offenders." *Id.* Otero alleged that this amounted to HPD's engagement in "malicious conduct and conspir[ing] with the [the Building Defendants] to conceal their respective deficiencies for purpose of evading prosecution and/or disciplinary action." *Id.*
- May 2–3, 2023: On May 2, 2023, HPD's Mitchell-Lama Constituent Services team emailed Otero in response to his earlier correspondence. *Id.* at 100. HPD stated that management could not guarantee a smoke-free apartment as the shareholders had denied a smoke-free building proposal, that HPD regularly conducts audits to ensure inspections are completed, and that only the Building Defendants were responsible for matters relating to a change of unit, tenancy records, and unit maintenance. *Id.* HPD also shared that "[Metro] informed [HPD] that the work needed to repair the leaking window was completed… and the area surrounding the window was resealed approximately a year ago." *Id.* On May 3, 2023, Otero replied to that email asking for the name of the person at HPD that had sent the May 2, 2023 email. *Id.* at 103.
- July 24, 2023: Otero sent a letter to HPD claiming their May 2, 2023 email was "baseless" and that the agency has "deliberately withheld lawfully requested information pertaining to [his] claims against [the Building Defendants.]" *Id.* at 105; Doc. 9 ¶ 25.
- August 7, 2023: Otero sent another letter claiming that HPD's response only selectively disclosed documents and information in an effort to "discourage additional inquiries, demoralize, and impede [his] efforts in pursuing various actions" concerning housing conditions. Doc. 9-5 at 2–3. He alleged that HPD and its employees had "engaged in civil conspiracy by deliberately withholding documents and/or information [he] requested," causing him "defamation, interference with prospective economic advantage and severe emotional distress." *Id.* He concluded that letter stating that HPD has

> "demonstrated gross negligence" and informing that he planned to pursue legal action if HPD did not reply. *Id.*

Apart from his personal communications with HPD, Otero provides information involving the reputation of the Mitchell-Lama program. He cites then-Mayor Eric Adams stating that "Mitchell-Lama boards and housing companies 'have run amok, playing by their own rules… consequently, HPD has allowed housing companies to defy the rules regarding apartment allocation, financial reporting and contracting.'" Doc. 9 ¶ 40. Otero also mentions a July 2015 report from the State Comptroller's Office referencing Mitchell-Lama housing companies' failure to maintain waiting and lottery lists. *Id.* ¶ 42–44. Otero mentions recent rule-making efforts which he claims are shareholder efforts to improve oversight and transparency of Mitchell-Lama developments, as well as recent publications mentioning HPD and housing costs. *Id.* ¶ 45–48.

**C. Procedural History.**

Otero filed the instant complaint on February 5, 2025.[7] *See* Doc. 9. Otero asserts four claims against all Defendants: (1) § 1983 claims; (2) violations of the Fair Housing Act (FHA) and the Americans with Disabilities Act (ACA);[8] (3) racial discrimination claims; and (4) state tort claims, specifically fraudulent concealment and negligent misrepresentation. *Id.* During a telephonic conference on September 5, 2025, the Court granted the City Defendants and the Building Defendants leave to file respective motions to dismiss Otero's claims. *See* Docs. 22, 23. Both motions were fully briefed on March 9, 2026. *See* Docs. 52, 53.

---

[7] Prior to filing the instant action, Otero filed a complaint against the Building Defendants in New York State Supreme Court. Doc. 9-5 at 9. The New York State Supreme Court bears Index No. 160169/2021. Otero was also the Respondent in a non-payment of rent case in New York City Housing Court under Index Number LT-324854-23/NY. Doc. 38 at 8. The Building Defendants urge the Court to dismiss Otero's claims on the basis of res judicata given these prior proceedings. Doc. 38 at 20. Because the Court is dismissing all claims on other grounds, it need not reach the res judicata ground for dismissal.

[8] Otero titles his second count as "Violation of the Fair Housing Act." Doc. 9 at 17. However, Defendants note that this count references the ADA in addition to the FHA. Docs. 36 at 18, 38 at 14. For this reason, the Court liberally construes the FAC as asserting federal claims under both the FHA and the ADA.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007)).

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,' " and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Courts liberally construe pleadings prepared by *pro se* litigants and hold them "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). It is appropriate to "liberally interpret[ ] *pro se* submissions to raise the strongest arguments that they suggest." *Gomez v. Brown*, 655 F. Supp. 2d 332, 342 (S.D.N.Y. 2009) (citation

and internal quotation omitted). "The underlying reasoning of this policy is that [i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Id.* (internal quotation omitted) (quoting *Traguth v. Zuck*, 710 E2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from complying with relevant rules of procedural and substantive law." *Langdon v. County of Columbia*, 321 F. Supp. 2d 481, 483 (N.D.N.Y. 2004) (citing *Traguth*, 710 F.2d at 95).

## III. DISCUSSION

Defendants claim the aforementioned 12(b)(6) legal standard disposes of all federal claims alleged by Otero. Doc. 36 at 16, Doc. 38 at 11. The Court agrees. As the City Defendants contend, the "FAC contains almost entirely conclusory allegations." Doc. 36 at 16. While Otero attaches nearly four hundred pages of exhibits to the FAC, the FAC does not refer to the facts alleged within these exhibits to state a single claim with particularity. Nor do such allegations exist within the exhibits themselves. Nonetheless, the legal issues presented by Otero warrant the dismissal of several claims without leave to amend. *See, e.g.*, *Reaves v. Department of Veterans Affairs*, No. 08 Civ. 1624 (RJD), 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) (declining to give *pro se* plaintiff leave to amend complaint for a second time because defendants were not state actors who could be subject to a § 1983 claim). For this reason, the Court will assess each claim in turn.

### A. Section 1983 claim.

Otero first alleges that Defendants violated his rights and seeks relief pursuant to 42 U.S.C. § 1983. Doc. 9 ¶ 81. Section 1983 creates a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation

of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

As a threshold issue, it is unclear which right under the Constitution or federal law Otero was violated. Otero at one point appears to base this claim on a failure to accommodate under the Fair Housing Act (FHA), and at another on "hazardous and dangerous condition[s]" in his apartment, and failure to protect him from those conditions. *See* Doc. 9 ¶¶ 3, 81. In the next section, the Court assesses whether Otero has sufficiently alleged an FHA claim against the City Defendants. As to the conditions in the apartment, there is no constitutional "guarantee of access to dwellings of a particular quality." *See Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill"); *see also Reaves v. Department of Veterans Affairs*, No. 08 Civ. 1624 (RJD), 2009 U.S. Dist. LEXIS 523, 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("[a]cess to food and shelter is not a constitutional right, nor is there any government obligation to provide adequate housing"). Because Otero fails to allege he was deprived of a legally cognizable federal right, his § 1983 claims fail. Granting Otero leave to amend these claims cannot solve the substantive legal defect. Thus, there is no indication that, if given leave to amend, Otero could state a valid § 1983 claim.

*1. Against the City Defendants.*

A § 1983 action against a municipal defendant requires a plaintiff to identify an official policy or custom that violates the plaintiff's constitutional or statutory rights. *Astacio v. City of New York*, No. 23-7598, 2025 WL 80069, at *2 (2d Cir. Jan. 13, 2025) (summary order) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978)). Further, the policy or custom must itself cause the violation of the plaintiff's right. *Jeanty v. 44 Grand St. Realty Corp.*, No. 25 Civ. 3065 (LLS), 2026 U.S. Dist.

LEXIS 201084, *8 (S.D.N.Y. September 3, 2026) (citing *Connick v. Thompson*, 563 U.S. 51 (2011)).

As the City Defendants note, Otero appears to allege a theory of *Monell* liability based on a failure to supervise, claiming that as a result of Defendants' "inattentiveness, negligence, carelessness, and recklessness," he suffered severe and permanent injuries. Doc. 36 at 17; Doc. 9 ¶ 82. Section 1983 claims based on a failure to act are limited to those in which "a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized" the conduct. *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 387–92 (1989)).

The City Defendants contend that Otero does not allege a causal relationship between HPD's alleged failure to supervise and the deprivation of Otero's rights. Doc. 36 at 17. The Court agrees. Instead of furnishing authority to suggest that HPD is responsible for apartment conditions or required to act, Otero cites the Mitchell-Lama regulations that explicitly assign these responsibilities to private entities like the Building Defendants. Doc. 9 ¶ 50–51. City rules and regulations require housing companies like WSSA to maintain their grounds and protect the health and safety of residents. 28 R.C.N.Y. § 3-7. They also require housing companies to hire managing agents like Metro to "properly maintain and operate the development" and respond to service requests. 28 R.C.N.Y. § 3-16. As a result, Otero does not actually establish any reason to infer a failure to supervise apart from his conclusory allegation, must less that such a failure caused him injury. *See* Doc. 9 ¶ 81–82.

In addition, the only pattern of misconduct Otero provides any facts in support of is a series of audits, reports, and statements involving Mitchell-Lama housing companies' mismanagement of waiting and lottery lists. Doc. 9 ¶¶ 40, 42-48. Even assuming that these statements plausibly allege a policy or custom on the part of the City Defendants, Otero fails to allege that this policy or custom caused the injuries he describes,

specifically, the hazardous conditions he alleges he was subjected to. Doc. 9 ¶ 81–82. His allegations of harm do not relate to policies or customs governing waiting and lottery lists. Doc. 9 ¶ 40. Because Otero has failed to allege that the City Defendants' failure to act led to a deprivation of his rights, the § 1983 claim against the City Defendants fails.

2. *Against the Building Defendants.*

The Building Defendants contend that Otero's § 1983 claim against them must be dismissed because they are private actors and are not acting under color of state law. Doc. 38 at 11-12. Section 1983 excludes from its reach "merely private conduct, no matter how discriminatory or wrongful." *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal citations omitted). Generally, there are three avenues for a private entity's actions to be attributable to the state: (1) when the entity acts "pursuant to the coercive power of the state" or under state control (the "compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity willfully participates in "joint activity" with the state, or its functions are "entwined with state policies" (the "joint action" test); or (3) when the state delegates to the entity an exclusive public function (the "public function" test). *Graham-Johnson v. City of Albany*, 471 F. Supp. 3d 506, 518 (N.D.N.Y. 2020) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

None of these tests are satisfied by Otero. As to compulsion and joint action, Otero does no more than allege that the Building Defendants are "entwined by coercive power of governmental agencies and its delegated policies." Doc. 9 ¶ 9. Otero's only reason to claim that the Building Defendants are acting under the color of state law is because they are subject to "the rules governed by the city and state." Doc. 9 ¶ 11. Otero certainly pleads this fact, but it is insufficient to show that the Building Defendants' actions are attributable to the state, and certainly insufficient to show that "a private party has conspired with a state actor." Doc. 47 at 9. Such conclusory assertions fail to assert that a state actor has compelled or significantly encouraged the Building Defendants. As

to the public function test, it is well established that public-private housing projects in general, and Mitchell-Lama in particular, fail the public function test. *See Meyers v. Berman*, No. 82 Civ. 4525 (CSH), 1982 U.S. Dist. LEXIS 15584, *22 (S.D.N.Y. Oct. 8, 1982) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)). Accordingly, the § 1983 claim against the Building Defendants is properly dismissed as a matter of law.

**B. Fair Housing Act (FHA) and Americans with Disabilities Act (ADA) claims.**

Otero next alleges that, as a "qualified individual" with a disability, his rights under the FHA and ADA have been violated. Doc. 9 ¶ 84–87. The FHA prohibits discrimination against any person on the basis of his disability in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with that dwelling. 42 U.S.C. § 3604(f)(2). The ADA prohibits discrimination on the basis of a disability in three parts: Title I, 42 U.S.C. § 12111 et seq. prohibits discrimination in employment; Title II, 42 U.S.C. § 12131 et seq. prohibits discrimination by public entities, such as state and local governments; and Title III, 42 U.S.C. § 12181 et seq. prohibits discrimination in access to public accommodations operated by private entities." *Askins v. Prestige Management Inc.*, No. 25 Civ. 451 (LTS), 2025 U.S. Dist. LEXIS 101441, *6 (N.Y.S.D. May 27, 2025) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)).

A plaintiff may show that a defendant has engaged in discrimination proscribed by the FHA and the ADA under "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Wilson v. Wilder Balter Partners, Inc.*, No. 13 Civ. 2595 (KMK), 2015 U.S. Dist. LEXIS 19178, at *17 (S.D.N.Y. February 17, 2015) (quoting *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565, 573 (2d Cir. 2003)).

Otero claims Defendants' actions, inaction, and "questionable conduct" have harmed him and impeded his right to quiet and peaceful enjoyment of his apartment.

Doc. 9 ¶ 87. Otero does not specify what he means by "questionable conduct." *See* Doc. 9 ¶ 84-87. Liberally construed, his allegations suggest he sought accommodation or a change in policy and the Court therefore interprets the FAC as asserting a failure to reasonably accommodate a disability under the third aforementioned theory.

To plead a failure to accommodate, a plaintiff must allege that: "(1) he suffers from a handicap as defined by the FHA[] [or a disability as defined by the ADA and the Rehabilitation Act]; (2) the defendant knew or reasonably should have known of the plaintiff's handicap [or disability]; (3) accommodation of the handicap [or disability] may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) [the] defendant[] refused to make such accommodation." *Wilson*, 2015 U.S. Dist. LEXIS 19178, at *19-20.

As a threshold matter, Otero fails to allege a prima facie case of failure to accommodate claim under the FHA or the ADA. Otero has not pleaded facts to demonstrate that he suffers from a handicap as defined by the FHA or the ADA. He only makes the conclusory allegation that he is a qualified individual with a disability due to post-traumatic stress disorder and pulmonary conditions. Doc. 9 ¶ 84–87. He states that the conditions in his apartment impacted his quiet enjoyment of the apartment and exacerbated his respiratory illnesses and mental health issues. *Id.*; Doc. 9-2 at 70. These allegations do not show that his condition would merit accommodation under the relevant statutes. The FHA, for example, defines a handicap as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C.A. § 3602. Otero does not allege facts indicating that his PTSD, bipolar disorder, and pulmonary issues meet this standard. *See, e.g.*, *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 609 (S.D.N.Y. 2016) (concluding that plaintiff did not show bipolar disorder qualified as a disability). Nor does Otero describe the accommodation he sought and the connection between his disability and the requested accommodation. The FAC therefore does not suggest that Defendants refused to accommodate Otero.

*1. Against the City Defendants.*

The City Defendants claim that Otero's failure to accommodate claim must also fail because the City Defendants are not housing providers regulated by the FHA and were not provided an opportunity to accommodate Otero. Doc. 36 at 19–22.

The FHA prohibits "*a housing provider's*" refusal to reasonably accommodate. *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014) (quoting 42 U.S.C. § 3604(f)(3)(B)). To be sure, in some contexts, the City serves as a housing provider. *See, e.g., Davis v. New York City Housing Authority*, 839 F. Supp. 215, 217 (S.D.N.Y. 1993) ("[The New York City Housing Authority] is the largest public housing agency in the United States, operating more than 320 projects, containing approximately 180,000 apartments which house nearly 500,000 people"). But here, the City Defendant HPD merely supervises the participation of housing companies like WSSA in the Mitchell-Lama program. Doc. 36 at 10-12. Otero does not suggest otherwise. *See* Doc. 9 ¶ 9. Because HPD is not the housing provider and not responsible for management, HPD was not in a position to accommodate Otero.

"To prevail on a reasonable accommodation claim, plaintiffs must first provide the [covered] entity an opportunity to accommodate them through the entity's established procedures." *Wilson*, 2015 U.S. Dist. LEXIS 19178, at *19-20. Referencing state and local laws, the City Defendants contend that HPD has an extremely minor role in reasonable accommodation requests specifically: HPD becomes involved if, and only if, a reasonable accommodation request is made to the housing company that would require waiver of the occupancy standards set by HPD. *See* 28 R.C.N.Y. § 3-02(m)(1)(vii). In that event, HPD reviews the request and issues a decision. *See* 28 R.C.N.Y. § 3-02(m)(1)(vii). Assuming without deciding that an adverse HPD determination at that juncture could qualify as a failure to accommodate, Otero has not alleged that HPD was in such a position to accommodate or that any request for a waiver was made to HPD.

Because this is the only method through which the City Defendants could have failed to accommodate Otero, the HPD and FHA claims fail against the City Defendants.

2. *Against The Building Defendants.*

The Building Defendants argue that Otero fails to allege a claim under the ADA or FHA because they are not subject to the ADA and because the FHA claim is time-barred. Doc. 38 at 8–12. The Court agrees. First, as to the ADA, none of the ADA's substantive areas apply to the Building Defendants: they are not Otero's employers, they are not public entities, and they do not operate public accommodations.[9] *See Askins*, 2025 U.S. Dist. LEXIS 101441 at *6. Therefore, they are not subject to the ADA's prohibitions. Second, the FAC was filed on February 5, 2025. *See* Doc. 9. The time to bring an FHA claim is no later than two years after the occurrence or the termination of an alleged discriminatory housing practice. 42 U.S.C. § 3613. Thus, any claims based on conduct predating February 5, 2023 are time-barred. *See* 42 U.S.C. § 3613. Otero does not allege any facts that suggest a failure to accommodate by the Building Defendants in the year 2023 or beyond. For these reasons, the Court need not reach the merits of Otero's failure to accommodate claim against the Building Defendants.

**C. Racial discrimination claim.**

Generally, claims of racial discrimination, such as those brought under 42 U.S.C. § 1981, require a plaintiff to plead (1) that they are a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant, and (3) the discrimination concerned one or more protected activities under the statute. *Wynn v. New York City Housing Authority*, No. 14 Civ. 2818 (SAS), 2015 U.S. Dist. LEXIS 99419, at *6 (S.D.N.Y. July 29, 2016) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7

[9] Public accommodations under Title III are defined to include "any inn, hotel, motel, or other establishment which provides lodging to transient guests." 42 U.S.C. § 2000a.1. Residential housing does not qualify as a public accommodation under Title III. *Reid v. Zackenbaum*, No. 05 Civ. 1569 (FB), 2005 U.S. Dist. LEXIS 17177, at *4 (E.D.N.Y. Aug. 17, 2005) ("A residential facility, such as an apartment, is not a public accommodation under the ADA").

F.3d 1085, 1087 (2d Cir. 1993)). At the pleading stage, the plaintiff bears only a "minimal burden of showing facts suggesting an inference of discriminatory motivation." *Bautista v. PR Gramercy Square Condominium*, 642 F. Supp. 3d 411, 424–25 (S.D.N.Y. 2022) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

Otero does not allege a single fact to make a showing on the elements for racial discrimination against the Defendants. None of the facts pleaded by Otero show an intent on the part of the Defendants to discriminate against him on the basis of his ethnic or racial origin. The Court is not required to "credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester County*, 3 F.4th 86, 90–91 (2d Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Setting aside Otero's conclusory allegations, the only fact that remains is Otero's assertion that in 2014, a flier that read "NO SPICS IN BOARD" was posted in the hallway on his floor. Doc. ¶ 76. Otero does not attribute this to any of the Defendants. Because the racial discrimination claims fail to allege sufficient facts, they are dismissed with respect to the City Defendants and the Building Defendants.

**D. State tort claims: fraudulent concealment and negligent misrepresentation.**

Otero alleges that the Defendants have committed fraudulent concealment and negligent misrepresentation to "avoid exposure of their gross respective maladministration and evade prosecution and/or disciplinary action." Doc. 9 ¶ 4. The elements of fraudulent concealment under New York law are: (1) a relationship between the contracting parties that creates a duty to disclose, (2) knowledge of the material facts by the party bound to disclose, (3) scienter, (4) reliance, and (5) damage. *Aetna Casualty & Surety Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005). A duty to disclose arises in one of three circumstances:

> "where the parties are in a fiduciary relationship; under the 'special facts doctrine,' where 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge'; or where a party has made a

> partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure."

*Id.* The elements of negligent misrepresentation under New York law are: "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014).

In addition, both claims "must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b)." *Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 218 (E.D.N.Y. 2004). Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

As a threshold matter, Otero does not attempt to allege that the Defendants had a duty to disclose. For this reason alone, these claims must fail against the Defendants. In addition, Otero's claim fails because he does not allege the circumstances constituting fraud with particularity and generally fails to make a showing on the claims' elements.

*1. Against the City Defendants.*

As to fraudulent concealment, Otero alleges that HPD withheld documents and information he requested, only selectively produced documents and information, deliberately delayed responding to him, ultimately stopped responding to him entirely, and failed to inspect his unit upon his request. *Id.* ¶ 23–29. He adds that these actions have caused him "defamation, interference with prospective economic advantage, and negligent infliction of emotional distress."[10] *Id.* Otero does not state with any specificity which material facts HPD allegedly concealed. The only information that Otero specifically alleges was concealed from him is the name and contact information of the

[10] Because the tort of negligent infliction of emotional distress is not pleaded by Otero, this possible future claim is not addressed by the Court at this time.

employee at HPD who wrote the May 2, 2023 email. Doc. 9 ¶ 23–24. Otero does not, and likely cannot, allege that this is a material fact the party is bound to disclose.

As to negligent misrepresentation, Otero's only allegation that the City Defendants imparted incorrect information is that on May 2, 2023, HPD "falsely asserted that the adverse conditions were corrected as specified by Metro." *Id.* ¶ 23. The exact statement from HPD was that the Building Defendants "had informed [HPD] that the work needed to repair the leaking window was completed." Doc. 9-5 at 100. Otero fails to allege any facts suggesting that HPD knew this was untrue or that Otero reasonably relied on the information.

2. *Against the Building Defendants.*

As to negligent misrepresentations, Otero alleges that the Building Defendants have engaged in "pervasive patterns of false statements intended to impose inequalities." *Id.* ¶ 27. He alleges the Building Defendants "manipulat[ed] and/or alter[ed] documents to evade liability," including his parking license agreement, a shareholder opinion survey involving smoking, and a shareholder vote on capital assessments. *Id.* ¶ 59. But Otero does not actually plead any facts that indicate the Building Defendants imparted any incorrect information. For example, Otero alleges that the Building Defendants' opinion survey about the smoke-free building initiative was "deceptive" because he takes issue with the requirement that a supermajority vote in favor to prohibit smoking across the building, the timing of the survey during a "vacation period," and what he considers Metro's failure to include relevant facts about the hazards associated with secondhand smoke. *Id.* ¶ 60-63. None of these allegations indicate that any incorrect information was imparted. And the FAC does not include any specific allegations as to the parking license agreement or capital assessment at all. Otero's response in opposition to the Defendants' motions suggests he is also alleging that the Building Defendants falsely told HPD that the adverse conditions in his unit were corrected. Doc. 47 at 4. Again, Otero

fails to allege he reasonably relied on the information since he would presumably know about what repairs have occurred in his apartment.

While Otero alleges the fraudulent concealment claim against the Building Defendants, it is not clear what actions by them he is claiming constituted concealment. For this reason alone, Otero has failed to aver the circumstances constituting fraudulent concealment with particularity under Rule 9(b).

### E. Leave to Amend

As a general rule, leave to amend a complaint should be freely granted. *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002). However, where the amendment would be futile or would result in undue prejudice to the opposing party denying leave to amend is proper. *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009). An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. County of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999). Otero is granted leave to amend for his FHA claim against the Building Defendants, racial discrimination claims against all Defendants, and state tort claims against all defendants.

## IV. CONCLUSION

For the reasons set forth above, the City Defendants' motion to dismiss is GRANTED and the Building Defendants' motion to dismiss is GRANTED. Otero is granted leave to file a second amended complaint for the above-mentioned claims by

October 30, 2026.[11] If he fails to file a second amended complaint by October 30, 2026, the case will be closed.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 35 and 37.

It is SO ORDERED.

Dated: September 30, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.

---

[11] Plaintiff is advised that there is a Pro Se Law Clinic available to assist self-represented parties in civil cases. The Clinic may be able to provide Plaintiff with advice in connection with his case. The Pro Se Law Clinic is run by a private organization called the City Bar Justice Center; it is not part of, or run by, the Court (and, among other things, therefore cannot accept filings on behalf of the Court, which must still be made by any self-represented party through the Court's Pro Se Intake Unit).

To make an appointment, Plaintiff must complete the City Bar Justice Center's intake form online. If Plaintiff has questions about the intake form or needs to highlight an urgent deadline already disclosed in the form, the clinic can be contacted by phone (212-382-4794) or email (fedprosdny@nycbar.org). In-person appointments in the Thurgood Marshall Courthouse in Manhattan are available Monday through Thursday, 10am to 4pm. Appointments are also available remotely Monday through Friday, 10am to 4pm.